(63 Misc. Rep. 461.)

PEOPLE v. TILLMAN.

(Court of General Sessions, New York County.  May. 1909.)

1. Perjury (§ 11*)—Materiality of Evidence.

Where a person conducting a business requiring a license, but who is not alleged to be the owner of one, pays money to a person not shown to have any official relation to the bureau of licenses of New York, or to any person employed in such bureau, such fact is not material, within Pen. Code, § 96, relating to perjury on an investigation under Greater New York Charter, § 119 (Laws 1901, p. 46, c. 466), by the commissioner of accounts, into the methods of the office of said bureau.

[Ed. Note.—For other cases, see Perjury, Cent. Dig. § 39; Dec. Dig. § 11.*]

2. Perjury (§ 25*)—Indictment—Materiality of Testimony.

An indictment for perjury, charging: That on special investigation it became material whether defendant ever received any money from the proprietor of a common show in New York; that defendant swore that he never had received any money from such person, whereas, in truth he had received from him certain sums mentioned in the indictment at times therein stated; and that such testimony was willfully false—was demurrable on the ground that the alleged false testimony was immaterial.

[Ed. Note.—For other cases, see Perjury, Cent. Dig. § 86; Dec. Dig. § 25.*]

Arthur G. Tillman was convicted of perjury.  Demurrer allowed.

Abraham Levy, for demurrer.

William Travers Jerome, Dist. Atty. (Charles Albert Perkins, of counsel), opposed.

CRAIN, J.  The defendant demurs to an indictment charging him with a violation of section 96 of the Penal Code (section 1620, Penal Law).  That section provides that:

"A person who swears * * * that he will truly testify, * * * upon any inquiry, or on any occasion in which an oath * * * may lawfully be administered, and who on such * * * inquiry or other occasion, willfully and knowingly testifies * * * falsely, in any material matter, or states in his testimony, * * * any material matter to be true which he knows to be false, is guilty of perjury."

The demurrer is upon the alleged grounds:  (1) That the indictment does not conform substantially to the requirements of sections 275 and 276 of the Code of Criminal Procedure; and (2) that the facts stated do not constitute a crime.

The essential elements in the crime of perjury are:  (1) That a lawful oath shall have been administered to the defendant;  (2) that it shall have been administered by a competent authority;  (3) that it shall have been administered upon an occasion permitting of its lawful administration;  (4) that consequent upon it testimony shall have have been adduced from the defendant;  (5) that such testimony shall have been false;  (6) that it shall have been false to the knowledge of the defendant;  (7) that it shall have been willfully given by the defendant;  and (8) that it shall relate to a matter material to the inquiry.  Each of these constituent elements of the crime must be alleged in the indictment.

It is alleged, in substance, in the indictment: That two municipal officers of the city of New York, known as "commissioners of accounts," were conducting, at the time named in the indictment, a special inquiry into the "accounts" and "methods" of another municipal office of such city, known as the "bureau of licenses" attached to the mayor's office; that for the purpose of such examination such commissioners deemed it necessary to examine under oath the defendant; that, in consequence, the defendant appeared before them in the county of New York at the time named, as a witness, and took oath before one of such commissioners that the evidence which he should give upon such examination should be the truth, the whole truth, and nothing but the truth; that such commissioner was authorized by law to administer such oath; that upon such examination it became material whether the defendant "ever received any money from one Francis M. Edwards, the proprietor of a common show in that portion of the city of New York commonly called Jamaica"; that the defendant falsely swore that he never had received any money from said Edwards, whereas, in truth and in fact he had collected and received from said Edwards certain sums mentioned in the indictment, at times as therein stated; and that such testimony was knowingly and willfully false.

No question is raised as to the sufficiency of the allegations in the indictment intended to set forth the first seven elements of the crime, as above enumerated. The defendant's principal contention is that the subject-matter of inquiry is not sufficiently described in the indictment to permit the defendant to litigate upon a trial the question of the materiality of the alleged false testimony.

The subject-matter of inquiry must be described with sufficient certainty in an indictment to enable a court to decide, under certain circumstances, as matter of law, whether or not a response admittedly made and concededly, knowingly, and willfully false was or was not material, and with sufficient certainty to enable a trial jury, under other conditions, to pass upon the question of materiality as one of fact. Two justices of the Appellate Division in this department were of opinion, in the case of People v. Gillette, 126 App. Div. 665, 111 N. Y. Supp. 133, that the indictment there under consideration, charging perjury, was bad for what they deemed an insufficient description of the subject-matter with respect to which the alleged false answers were said to have been given. That case does not require a holding in the case at bar that, for like reasons, the indictment in the case at bar is bad, because, within the principle stated on this point in the opinion of Mr. Justice McLaughlin in the Gillette Case, the indictment at bar does sufficiently describe the subject-matter of inquiry. In the Gillette Case the alleged perjury was committed in an investigation before a grand jury. In the case at bar it was committed upon a special investigation before commissioners of accounts.

The subject-matter within the scope of possible investigation by a grand jury, considered from the standpoint of the powers of a grand jury, is infinitely wider than that within the scope of possible investigation by such commissioners of accounts. In the Gillette Case, moreover, the indictment contained in fact no statement specifying

the subject under investigation, for it did not specify even insurance companies as the matter of inquiry, nor any particular class of crimes as those to be inquired about. The language was:

"A certain investigation and inquiry for the purpose, among other things, of ascertaining whether officers or employés of any description of life insurance companies in this state have lately violated, in the county of New York, the criminal laws of the state of New York and of inquiry into all crimes by any such officers or employés committed or triable in said county." People v. Gillette, 126 App. Div. 666, 111 N. Y. Supp. 133.

In the case at bar, the indictment states that the investigation related to a particular office, namely, the office of the bureau of licenses attached to the mayor's office of the city of New York, and more particularly to the "accounts" and "methods" of that office. This language, as before stated, is limited by the circumscribed powers of investigation conferred by law upon the commissioners of accounts. Greater New York Charter, § 119 (Laws 1901, p. 46, c. 466).

A graver question, however, remains, namely, whether the formal allegation of materiality in the indictment is not negatived in the indictment itself; and to this question attention is directed.

The allegation of materiality in the indictment in the case at bar is sufficient in form. "Formerly, under the common law, it was necessary that an indictment for perjury should set forth at length the proceedings in which the alleged perjured testimony was given. This rule, however, has been modified by statute so that now 'it is sufficient to set forth the substance of the controversy or matter in respect to which the crime was committed, and in what court, or before whom, the oath alleged to be false was taken, and that the court or person before whom it was taken had authority to administer it'; but it need not set forth the pleadings, record, or proceedings with which the oath was connected. Code Cr. Proc. § 291." People v. Gillette, 126 App. Div. 665, 670, 111 N. Y. Supp. 133. See, also, 2 Bishop, Crim. Proc. § 921; Wood v. People, 59 N. Y. 117.

Because the indictment contains a sufficient averment of materiality, it did not need to set forth the facts upon which such allegation is based. In other words, it was not necessary to allege how or why the alleged false testimony was material. It is sufficient to sustain the indictment against this demurrer if, by possibility, the false testimony could have been material, or, to put it differently, if its materiality is not negatived in the indictment. If by possibility it might have directly related to the point of inquiry, or if by possibility it might have been directly related to a fact relevant to the point of inquiry, or if by possibility it might have been circumstantially material, either because it by possibility might have formed a link in the chain of evidence or by possibility have corroborated or rendered more credible the substantial parts of the evidence, it cannot, on this demurrer, be regarded as necessarily immaterial. The relevancy or probative force of evidence is that which gives it its harmful tendency if false, and evidence not regarded as relevant is deemed immaterial, and perjury cannot be assigned therefor. Evidence of this kind is properly inadmissible, says Prof. Chase, in his admirable article in 3 Criminal Law Magazine, 459; but it is often so interwoven.

with the substantial evidence that it is impracticable to exclude it. The. mere fact of its admission cannot render it material.

Whether evidence shall be deemed material must be determined from its own essential nature as related to the point of inquiry. What was the nature or object of the inquiry in the case at bar? This must be ascertained as the starting point, before it can be determined what evidence has such a relation thereto as to have a legitimate tendency as a means of proof. The limitations upon the scope of the inquiry were threefold, namely: First, those arising from the nature of the subject to be investigated, in this case the "accounts" and "methods" of the office of the bureau of licenses in the mayor's office; second, those arising from the powers of those by whom the investigation was to be conducted (in this case the commissioners of accounts); and, third, those arising from the purpose of the investigation (in this case the making of a report to the mayor and the board of aldermen for the purpose of causing such administrative or legislative action in the premises as such authorities might deem proper).

Attention is therefore directed, first, to the question of materiality from the standpoint of the nature of the subject to be investigated. The bureau of licenses was established by municipal ordinance. It was established for the purpose of "issuing" and "recording" licenses authorized by resolution or ordinance of the board of aldermen or in force at the time of the creation of the bureau. See title 300 of the Revised Ordinances adopted pursuant to section 51 of the Greater New York Charter. It was not made a part of the duties of the chief of the bureau, or of his deputies or assistants, or of any person connected with the bureau, to ascertain whether any person conducting a business which could only lawfully be conducted under a license had or had not taken out one, and the power to fine any one who had not taken out a license who was under legal obligation to do so·rested solely with the mayor. All licenses were to be "issued" by the bureau in the sense, only, that they were to be according to an established form (not, however, a form prescribed by the chief of the bureau or those under him) procurable by application to the bureau and from those in charge of the bureau and to be entered by·them in registers. No licenses were to be "granted" by the bureau, but only by the mayor, to whom was likewise given sole power to suspend or revoke a license. No discretion was conferred upon those in charge of the bureau to deny applications, or place any condition upon the granting of licenses, provided the business was one which could not be lawfully conducted without a license. The bureau acted ministerially. The discretion was vested in the mayor. William Fox Amusement Co. v. George B. McClellan, as Mayor, 62 Misc. Rep. 100, 114 N. Y. Supp. 594.

Those in charge of the bureau were under mandatory requirements respecting certain bookkeeping matters and certain matters of financial accounting. The inquiry into the "accounts" and "methods" of the bureau was therefore an inquiry into the way in which those officially connected with the bureau did that which they were required by law or ordinance to do, as, for example: Whether or not they issued the prescribed form of license, and that only; whether they classified,

recorded, and indexed as required records of the licenses so issued; whether or not they licensed only citizens of the United States or those who had regularly declared their intention to become citizens; whether or not they issued licenses in violation of the ordinance for gambling or games of chance; whether or not they deposited the moneys received by them in their official capacity when and where required by ordinance; whether the office was kept open during the hours required by law or ordinance; and whether those on the pay roll in it attended at the office during office hours and respectively discharged the duties incumbent upon them. It was thus, necessarily, an investigation into the narrow and circumscribed workings of a bureau of narrow and circumscribed ministerial powers.

Secondly. Attention is directed to the question of materiality from the standpoint of the power of those by whom the investigation was to be conducted. The commissioners of accounts are municipal officers whose powers are conferred by and defined in section 119 of the Greater New York Charter (Laws 1901, c. 466). They are therein empowered, among other things, to make "such special examination of the accounts and methods of the departments and offices of the city of New York * * * as they may deem for the best interest of the city and report to the mayor and the board of aldermen the results thereof." They are further given power "for the purpose of ascertaining facts in connection with their examination * * * to compel the attendance of witnesses, to administer oaths and to examine such persons as they may deem necessary. * * *" In making such examination, they were permitted to ask such questions as would enable them to ascertain how the accounts of the bureau of licenses were kept and how the business thereof was conducted. "The only limitation upon such examination" was that the questions propounded "should be relevant and pertinent." It was in no sense a judicial proceeding. See Matter of Hertle, 54 Misc. Rep. 354, 356, 105 N. Y. Supp. 1022, 1024, opinion by O'Gorman, J. "For the purpose of making these examinations they [i. e., the commissioners of accounts] were given power to examine witnesses." They were clothed with the power "to ascertain not only what the books of the office showed, but what they ought to show, by requiring witnesses to submit to an examination, to the end that the transactions of the office in all its details, as well as every act of the officer himself and his subordinates and employés in connection therewith, might be laid before the mayor." See Matter of Hertle (In re Ahearn) 120 App. Div. 717, 720, 105 N. Y. Supp. 765, opinion of the court by McLaughlin, J.

It was therefore necessarily an investigation directed and limited by its relevancy to one or more of the following points, namely: (1) What the books of the bureau of licenses showed; (2) what they should have showed; (3) transactions of the bureau of licenses; (4) acts of the chief of the bureau in connection with his office; and (5) acts of his subordinates in connection with the administration of the bureau. It could not lawfully comprehend transactions other than those of the bureau under investigation, nor lawfully comprehend acts of persons not connected with the bureau under investigation.

Attention is directed, thirdly, to the question of materiality, considered from the standpoint of the purpose of the examination. The purpose of the examination was to furnish "the mayor with accurate information as to the state, conditions and workings of the office investigated. * * * They [i. e., commissioners of accounts] may pursue their investigation so long as the examination shall be relevant and pertinent to the subject-matter of their inquiry." Same case, page 721, 120 App. Div., and page 768, 105 N. Y. Supp. The purpose of the investigation is primarily to ascertain the condition of the office investigated from an administrative standpoint, to the end that, if the office was not administered efficiently, action might be taken by the authority having the power to remove the delinquent incumbents, or by the board of aldermen, if further ordinances were required to render the office efficient. Thus the purpose of such inquiry is in strong contrast with such investigation as under section 260 of the Code of Criminal Procedure a grand jury may make; such latter investigation being for the discovery and punishment, under the criminal law, of willful and corrupt misconduct in office by public officers.

Attention is now directed to the question of materiality from the standpoint of the essential nature of the inquiry; that is to say, the question put and answered considered in itself.

The inquiry put to the defendant, as already stated, was as to whether he had ever received any money from one Francis M. Edwards, the proprietor of a common show in Jamaica, New York City. He appears to have testified that he never had received any money from Edwards and had not during the period mentioned collected certain moneys from Edwards. It is charged that this was false. In the light of the essential nature of this testimony as related to the point of inquiry on the occasion on which it was given, how was it material? What light would a true answer have shed upon the only lawful subject of inquiry? There is no allegation in the indictment that, at the time named, Edwards was the holder of a license; but there is an inference to be drawn that he was carrying on a business which could only lawfully be carried on if licensed. If he was running without a license, he was, however, beyond the control or interference of any one connected with the bureau under investigation. They had no power to compel him to take out one, or to force him to discontinue his business, or to punish him by fine or otherwise. If he wished a license—not having one—they had no power to refuse him one if his business required licensing. If he already had a license, they had no supervisory power over his business and no power to suspend or revoke his license. In any and every conceivable situation, he was beyond their official action. He could by possibility in connection with his business come in contact with them at but one point, namely, when he asked for the issuance of a license. They had no discretion to refuse it, if he paid for it the price established by an authority other than themselves and which they could neither lessen nor increase. It does not appear from the indictment that the defendant had any official or other relation to the office being investigated, or that he was a person who, under any provision of law, might have been liable to pay a license fee.

Is the fact of the payment of money for an undisclosed purpose,

by a person conducting a business which cannot lawfully be conducted without a license, but who is not alleged to be the holder of one, to a person not shown to hold any official relation to the office of the bureau of licenses or any relation to any person employed in it, by possibility "material," in the sense in which that word is used in the statute (Pen. Code, § 96; Penal Law, § 1620), in its relation to the crime of perjury, on a special inquiry by commissioners of accounts under section 119 of the Greater New York Charter into the "accounts" and "methods" of the office of the bureau of licenses in the mayor's office?

To put this question is to answer it. Why should money be paid by such a man to a person not connected wtih the bureau, and what significance would an affirmative answer that money had been so paid have had? Such payment did not relate to the "accounts" of the bureau nor to the "methods" of the bureaus. Even upon the assumption that it might have been a link in a chain of evidence to establish that some one connected with the bureau had committed a crime, or even a crime rendered possible of perpetration by reason of his relation to the bureau, it did not relate to an act of official misteasance or nonfeasance within the purview of commissioners of accounts, however relevant and pertinent, and therefore material, it might have been on an investigation by a grand jury, as a link in a chain of evidence to determine whether there had been willful and corrupt misconduct in the office of the bureau of licenses by an officer or employé of the same.

The evidence of the defendant in the case at bar alleged to have been false was plainly wholly foreign from the purpose of the investigation and had no bearing upon the point of inquiry. See Power v. Price, 16 Wend. 450; Wood v. People, 59 N. Y. 117; People v. O'Reilly, 9 Abb. N. C. 77 (reversed on other grounds); O'Reilly v. People, 10 Abb. N. C. 53. It is because it appears from the face of the indictment that it did not directly relate to the point of inquiry, nor directly relate to any fact relevant to the point of inquiry, and was not circumstantially material as either forming a link in a chain of evidence or as corroborating or rendering more credible the substantial parts of the evidence, that it is seen to be immaterial.

The rule that a pleading must be construed so as to make all parts harmonize, if possible, applies to matters of form rather than to matters of substance. While all reasonable intendments are to be indulged in support of a pleading demurred to, on demurrer the whole complaint must be taken together in determining whether it contains a cause of action, as well allegations tending to discharge as those tending to charge the defendant. Calvo v. Davies, 73 N. Y. 211, 218, 29 Am. Rep. 130; Fleischmann v. Bennett, 23 Hun, 200, affirmed 87 N. Y. 231. See opinion of the Court of Appeals, at page 238 of 87 N. Y. And the same rule is applicable to an indictment. The people, under the indictment as it stands, could not make proof on the trial entitling them to a verdict of guilty. With respect to the essential element pertaining to the materiality of the testimony alleged to have been false, the indictment answers itself; and therefore the demurrer is well taken.

Demurrer allowed.